UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| D.H. Evers on behalf of the Underwriting Members of Syndicate 535 at Lloyd's,<br><br>Plaintiff,<br><br>v.<br><br>Purse Seine Vessel Owners Association, a Washington corporation, and F/V Aleutian Spirit, Inc., an Alaska corporation,<br><br>Defendants. | No.:  CV 09-00791 RSM<br><br>**RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |
| D.H. Evers on behalf of the Underwriting Members of Syndicate 535 at Lloyd's,<br><br>Third-Party Plaintiffs,<br><br>v.<br><br>Robert F. Kehoe and National Casualty Co.,<br><br>Third-Party Defendants. | |

The Motion for Summary Judgment filed by Plaintiff D.H. Evers on behalf of the Underwriting Members of Syndicate 535 at Lloyd's ("Underwriters") is premised on a faulty choice of law analysis. Underwriters' argument that Washington law applies is not supported by controlling law. Instead, Alaska law applies to this insurance coverage case because it concerns coverage under a policy of marine protection and indemnity ("P&I") insurance covering the liabilities of an Alaskan insured who owned and operated an Alaskan vessel, for the Alaskan vessel owner's liabilities

LAW OFFICES OF
**NICOLL BLACK & FEIG**
A PROFESSIONAL LIMITED LIABILITY COMPANY
816 SECOND AVENUE, SUITE 300
SEATTLE, WASHINGTON 98104
TEL: 206-838-7555
FAX: 206-838-7515

determined in a trial in Alaska state court, arising out of a personal injury suffered by an Alaskan crew member as a result of an accident that occurred in Alaska. The insurance policy in this case can only cover the insured Alaska vessel owner for its liabilities that are causally operationally related to the insured vessel, the F/V ALEUTIAN SPIRIT, which was operated exclusively in and around Alaska waters and home ported in Alaska. The insurance policy's one year suit limitation would not be enforceable under Alaska law in the absence of proof that breach of the provision prejudiced Underwriters. Mistakenly believing that the suit limitation clause will be blindly enforced under Washington law, Underwriters urge the Court to adopt a faulty choice of law analysis despite the absence of meaningful contacts with Washington and the overwhelming contacts between the contract, the dispute, and Alaska.

Underwriters' Motion for Summary Judgment should be denied because: (1) Alaska, the state with the most significant relationship to the insurance contract, does not enforce suit limitation provisions in insurance policies in the absence of proof that the insurer has been prejudiced; (2) Underwriters have neither plead nor offered any evidence of prejudice; (3) even if Washington law applies, the suit limitation provision should not be enforced because Underwriters have by their action and inaction either waived it or are estopped from enforcing it; and, (4) even if Washington law applies and the suit limitation is enforced despite the evidence supporting waiver and estoppel, the suit limitation provision cannot apply to PSVOA's and ASI's extra-contractual causes of action.[1]

## I.    FACTS

### A.    F/V Aleutian Spirit, Inc. ("ASI").

ASI owns the fishing vessel ("F/V") ALEUTIAN SPIRIT. [Declaration of James Miller

---

[1] Defendants' other causes of action against Underwriters are (1) a breach of a separate contract, which includes no suit limitation provision, regarding the insurers' agreement to pay the Miller Settlement in excess of Policy limits and having PSVOA fund the settlement agreement reached in the underlying action; (2) a bad-faith action, which is a tort; and, (3) a consumer protection act action, which is a statutory action not based on the contract. The policy's suit limitation provision has no application to those causes of action. [See Section II.G.]. Underwriters ignore the issue and offer no reason why the Policy provision would apply to the extra-contractual causes of action and Defendants can only speculate what those arguments might be. If Underwriters are waiting to make their arguments for the first time in their Reply to this Opposition, then Defendants reserve the right to follow the procedures set forth in the Local Rules to file a Surreply and a Motion to Strike such new arguments that could and should have been made in the Motion for Summary Judgment.

LAW OFFICES OF
**NICOLL BLACK & FEIG**
A PROFESSIONAL LIMITED LIABILITY COMPANY
816 SECOND AVENUE, SUITE 300
SEATTLE, WASHINGTON 98104
TEL: 206-838-7555
FAX: 206-838-7515

("Miller Dec."), ¶2]. James Miller is the President of ASI and the master of the F/V ALEUTIAN SPIRIT. [Id., ¶3]. During 2001 and 2002, the F/V ALEUTIAN SPIRIT fished and operated exclusively in and around the waters of Southeast Alaska. [Id.]. It never operated in Washington waters. [Id.]. The insurance certificate ASI obtained from the Seine Vessel Reserve ("SVR") protected ASI against liabilities arising out of ownership and operation of the F/V ALEUTIAN SPIRIT. [Id.]. ASI received its certificate in Alaska. [Id.]. ASI is an Alaska corporation with a principal place of business in Petersburg, Alaska. [Plaintiffs' Responses to Defendants' Counterclaims ("Answer"), DKT #12, ¶3].

**B.** **Purse Seine Vessel Owners Association ("PSVOA").**

PSVOA is a non-profit Washington organization established in 1936 to further the interests of the commercial fishing fleet. [Declaration of Robert Zuanich ("Zuanich Dec."), ¶2]. PSVOA is the largest trade group in the State of Washington representing over 400 vessel owners operating in various fisheries throughout the west coast of Alaska. [Id.]. PSVOA maintains an office in Alaska. [Id.]. In the 2001 and 2002 timeframe, the majority of the fishing operations of the PSVOA member vessels occurred in Alaskan waters and throughout the west coast of Alaska. [Id.]. Besides its headquarters in Seattle, PSVOA also maintains an office in Juneau, Alaska. [Id.].

**C.** **Seine Vessels' Reserve ("SVR").**

SVR is a voluntary association of fishing vessel owners who are also members of the PSVOA. [Zuanich Dec., ¶3]. The purpose of SVR is to promote the safe operation and maintenance of vessels, provide for the adjustment of claims, and create a fund for the payment of losses or claims made by or against its members. [Id.]. SVR is a PSVOA-affiliate. [Id.]. Neither PSVOA nor SVR own vessels. [Id., ¶4].

**D.** **Acordia and Underwriters.**

Stan Ogden was a broker for Acordia Northwest, Inc. ("Acordia") (which later became Wells

LAW OFFICES OF
**NICOLL BLACK & FEIG**
A PROFESSIONAL LIMITED LIABILITY COMPANY
816 SECOND AVENUE, SUITE 300
SEATTLE, WASHINGTON 98104
TEL: 206-838-7555
FAX: 206-838-7515

Fargo Investment Services) and a "coverholder" for Underwriters. [Nicoll Dec., Ex. 1].[2] A coverholder is authorized by Underwriters to enter into contracts of insurance and/or to issue insurance documentation on behalf of the Underwriters as delineated in and subject to the terms of the Binding Authority Agreement ("BAA"). [See id.; see Answer, ¶6]. In Section 1 of the BAA, Underwriters authorized Acordia to adjust claims in accordance with the BAA's terms and conditions. [Id., Ex 1, WF00480].

**E.    The Policy.**

Prior to the 2001-2002, PSVOA and SVR had a history of working with Acordia Northwest, Inc. ("Acordia") to meet the insurance needs of its member vessels. [Zuanich Dec., ¶5]. In 2001, on behalf of its membership, PSVOA sought insurance through Acordia to cover pool liabilities in excess of an annual aggregate of $2.2 million. [Id.]. Specifically, PSVOA sought "stop-loss" insurance to cover each member's insured losses and liabilities in excess of the annual aggregate up to $1 million per occurrence, for each member vessel. [Id.]. SVR purchased, on behalf of each of the members of PSVOA, Policy No. PMH2045/01 (the "Policy"), as stop-loss insurance to cover certain of their marine losses and liabilities up to $1 Million per occurrence per insured vessel, in excess of the pool's annual aggregate deductible of $2.2 Million. [Id., Ex. 3; Answer, ¶9]. PSVOA was a named insured under the Policy. [Id., Ex. 2, 3]. F/V Aleutian Spirit, Inc. ("ASI") was a member of PSVOA and an "Individual Certificate Holder." [Id., Ex. 2]. The Policy named, among others, "Individual Certificate Holders as declared," as insureds. [Id.]. Ogden bound Underwriters on the Policy pursuant to authority granted to him in the BAA. [See Zuanich Dec., Ex. 3, WF 00081 (Ogden signature on declaration

---

[2] Defendants prepared a declaration for Stan Ogden of Wells Fargo Investment Services (formerly Acordia). Defendants scheduled a meeting with Ogden on Friday, October 23, 2009. Prior to the meeting, National Casualty Co., who was also intending to attend the meeting, wrote Underwriters a letter alerting Underwriters to the meeting. [Declaration of Christopher W. Nicoll ("Nicoll Dec."), Ex. 20]. On the day before the meeting, Ogden postponed the meeting so he could obtain counsel, apparently after receiving a communication from Underwriters, the contents of which are unknown to Defendants. Many of the documents attached to the Nicoll Dec. (those with WF Bates labels) were received by Defendants from Ogden. It was Defendants' expectation that, by way of declaration, Ogden was going to authenticate the documents for use on this Motion. If Underwriters make note of the fact that Ogden/Acordia have not authenticated the documents, thus rendering them inadmissible on the Motion for Summary Judgment, Defendants would ask the Court for a 45-day continuance under Fed.R.Civ.P. 56(f) to allow Defendants to serve discovery on Underwriters, depose Ogden and Underwriters, and obtain the necessary evidentiary foundations for the documents.

LAW OFFICES OF
**NICOLL BLACK & FEIG**
A PROFESSIONAL LIMITED LIABILITY COMPANY
816 SECOND AVENUE, SUITE 300
SEATTLE, WASHINGTON 98104
TEL: 206-838-7555
FAX: 206-838-7515

page)].

National Casualty Co. ("National") and Underwriters each subscribed to 50% of the Policy. [Zuanich Dec., ¶7]. National was the leading domestic insurer and PSVOA understood that Underwriters followed National's lead with respect to adjusting claims. [Id.]. Underwriters agreed, pursuant to the "Claims Authority Agreement" within the BAA, to be "bound by all decisions, surveys, and settlements, excluding *ex gratia*," agreed by the leading domestic insurer. [Nicoll Dec., Ex. 1, WF 00502]. The BAA does not define the term "*ex gratia*". [See id.]. The Policy does not mention the term. [See Zuanich Dec., Ex. 3].

Regarding claims on the Policy, as of June 2007 report to Acordia, approximately 31 claims were processed on the Policy, of which approximately 20 were P&I claims. [Zuanich Dec., ¶7]. In adjusting claims, SVR and PSVOA worked with agents for both National and Underwriters. [Id.]. Acordia and Stan Ogden were the Underwriters' agents with whom we communicated. [Id.]. As claims were settled in excess of the $2.2 million aggregate, SVR would receive payments and reimbursement from both National and Underwriters. [Id.].

F.      **Miller Claim and Miller Liability.**

In April 2002, James Miller's son, Jason Miller, a crewmember onboard the F/V ALEUTIAN SPIRIT, was injured while the vessel was moored in Juneau, Alaska. [Miller Dec., ¶4]. Jason Miller sued ASI in Superior Court in Juneau, Alaska. [Id.].

Ogden received pre-trial reports from appointed defense counsel, Mr. Robert Kehoe, and forwarded them to Underwriters via Underwriters' managing agent, Cooper & Gay ("Cooper") using both faxes and e-mail. [See e.g., Nicoll Dec., Ex. 2]. On June 11, 2007, Ogden forwarded to Underwriters a litigation plan he had received from Kehoe. [Id., WF 00032-41]. The litigation plan reported that the case was going to trial on July 16, 2007 [id., WF 00041] and that Miller's attorney had made a pre-trial settlement demand for $500,000 [id., WF 00038] that had been rejected, in addition to other details.

Trial in the matter of Jason Miller versus ASI ended in a substantial verdict against ASI

LAW OFFICES OF
**NICOLL BLACK & FEIG**
A PROFESSIONAL LIMITED LIABILITY COMPANY
816 SECOND AVENUE, SUITE 300
SEATTLE, WASHINGTON 98104
TEL: 206-838-7555
FAX: 206-838-7515

("Miller Liability"). [Zuanich Dec., ¶8; Answer, ¶15]. After trial, National reserved its rights to any portion of the judgment in excess of Policy limits. [Nicoll Dec., Ex. 3]. Ogden reported this to Underwriters on September 24, 2007 and apparently received no response. [See id.].

Subsequently, ASI's counsel James Brennan demanded that Underwriters and National settle the Miller Liability promptly in order to avoid imposition of damages against ASI in excess of Policy limits. [Zuanich Dec., ¶8]. Brennan accused the insurers (National and Underwriters) of bad faith because ASI was not informed of pre-trial settlement opportunities. [Id.]. In November 2007, Jason Miller's attorney offered to settle the Miller Liability for $1 million and left the offer open until December 7, 2007. [Id.].

## G. **Miller Settlement.**

On December 5, 2007, National's coverage counsel Christopher Bynog sent Ogden an email that stated, in relevant part:

> As we have previously discussed, settlement of the Miller lawsuit might be possible prior to the court ruling on the requests for attorneys' fees and interest. Attached are two letters regarding settlement. You will note that plaintiff is demanding $1 million to settle this matter. As you are aware Underwriters subscribe 50% of this risk. The policy limits are $1 Million dollars, but they are depleted by defense costs. At present, the remaining available limits are $840,494.51. Verdict was entered against Aleutian Spirit on July 19, 2007 for $768,417. That figure did not include attorneys fees which are awardable under two separate statutes. Final judgment has not been entered, but plaintiff's counsel has estimated that attorneys' fees will total approximately $90,000. Interest is estimated to exceed $175,000. Thus, the current estimated excess exposure is $192,922. We therefore seek Underwriters' agreement to fund their 50% share of any amount in excess of the policy limits that are necessary to settle this matter, up to 50% of the $192,922 in potential excess exposure. Please advise of Underwriters' position on this issue as soon as possible as the settlement offer expires December 7, 2007. <u>While we are attempting to achieve settlement and release of the entire policy, if we are not timely advised of Underwriters position, we may be forced to settle only our client's liability under the policy</u>. We await your soonest response.

[Nicoll Dec., Ex. 5 (emphasis added)]. Two days later, on December 7, 2007, National's coverage counsel, attorney Jay Sever of firm Phelps Dunbar, informed Ogden and PSVOA that the offer was accepted even though it would result in a settlement in excess of the Policy's $1 million limits ("Miller Settlement"). [Zuanich Dec., ¶9, Ex. 4; Nicoll Dec., Ex. 6]. PSVOA received a letter

LAW OFFICES OF
**NICOLL BLACK & FEIG**
A PROFESSIONAL LIMITED LIABILITY COMPANY
816 SECOND AVENUE, SUITE 300
SEATTLE, WASHINGTON 98104
TEL: 206-838-7555
FAX: 206-838-7515

addressed to Jason Miller's attorney and ASI's attorney from National stating, in relevant part:

> As you are aware Phelps Dunbar LLP represents National Casualty Company ("National") which subscribes 50% of the referenced policy (the "Policy"). The purpose of this letter is to memorialize the agreement to settle the Miller claim reached today between plaintiff Jason Miller, defendant Aleutian Spirit, Inc., Purse Seine Vessel Owners Association ("PSVOA"), National Casualty and Certain Underwriters at Lloyd's London ("Underwriters") subscribing the other 50% of the Policy. Pursuant to the settlement agreement, PSVOA and the insurers/reinsurers National Casualty and Underwriters will pay within 15 days from today a total of $1 million to Mr. Miller. In exchange, Mr. Miller agrees to dismiss with prejudice the referenced lawsuit and release any and all claims related to the accident at issue in the lawsuit against Aleutian Spirit, Inc., PSVOA, National and Underwriters. In addition, Aleutian Spirit, Inc. will release all claims it may have in this matter against PSVOA, National and Underwriters. The parties will execute mutual releases in separate documents at a later date.

[Id.]. The e-mail that accompanied the letter from National to Ogden stated, "Attached is a letter we are issuing today memorializing the agreement to settle the Miller lawsuit for $1 million. Plaintiffs would not accept our initial $950,000 offer. As the letter states, PSVOA will front the money and pay within 15 days. Of course, PSVOA will be looking to National Casualty and Underwriters to pay their 50% share of that amount. If you have any questions, please call." [Nicoll Dec., Ex. 19].

PSVOA calculated the payments owed by each insurer in order to fund the Miller Settlement and e-mailed Ogden concerning the calculations on December 12, 2007. [Zuanich Dec., ¶10, Ex. 5]. The total of all expenses related to the Miller Claim, net of the $2,500 deductible, related in Exhibit 5 was $1,253,642.14. [Id.; Answer, ¶24]. Neither Ogden nor Underwriters responded to alert PSVOA that Underwriters would not fund that portion of the Miller Settlement in excess of Policy limits. [Id.].

PSVOA received an e-mail from Sever on December 21, 2007 in which Sever communicated that the "reinsurers," which PSVOA understood to mean National and Underwriters, "were paying the excess amount (above remaining policy limits) of this settlement." [Zuanich Dec., ¶11, Ex. 6]. Ogden was copied on the e-mail. [Id.]. Neither Ogden nor Underwriters indicate any communicate disagreement with Sever's statement. [Id.]. At no time prior to this had Underwriters issued any reservation of rights in this matter. [Id.]. Sever requested PSVOA to fund up front the payment of $1 Million to Jason Miller in order to meet the demands of Jason Miller's attorney and to fund the Miller

LAW OFFICES OF
**NICOLL BLACK & FEIG**
A PROFESSIONAL LIMITED LIABILITY COMPANY
816 SECOND AVENUE, SUITE 300
SEATTLE, WASHINGTON 98104
TEL: 206-838-7555
FAX: 206-838-7515

Settlement. [Id.]. PSVOA funded the Miller Settlement in full on or about December 21, 2007 in reliance on Sever's December 21, 2007 e-mail. [Id.]. Ogden subsequently forwarded to Underwriters PSVOA's claim for reimbursement. [Id.; Nicoll Dec., Ex. 9].

**H.      PSVOA Claim For Reimbursement.**

After December 21, 2007, PSVOA waited to be reimbursed by the insurers. [Zuanich Dec., ¶12]. As expected, National paid its full 50% of the Miller Settlement, including that portion in excess of Policy limits. [Id.]. Underwriters, which were in "run off" at the time, did not pay promptly. [Id.]. The next time PSVOA heard from Underwriters on the matter was in May 2008, when Underwriters asked for additional information. [Id.]. Between May 27 and June 20, 2007, PSVOA provided Ogden information responsive to Underwriters' request for additional information. [Id.].

**I.      Underwriters' Denial and Subsequent Negotiation.**

On July 31, 2008, Ogden forwarded to PSVOA a memorandum from Underwriters denying the claim for reimbursement. [Zuanich Dec., ¶13; Nicoll Dec., Ex. 12, 13]. PSVOA was surprised. [Zuanich Dec., ¶13]. As far as PSVOA had been told by Ogden, the claim had been approved prior to accepting the settlement offer and prior to PSVOA's funding of the Miller Settlement. [Id.]. Over most of the subsequent year, PSVOA communicated with Ogden and Underwriters concerning reconsideration of the decision. [Id.; Nicoll Dec., Ex. 14-18]. By e-mail of February 25, 2009, Underwriters stated that they were "still willing to consider this matter further" and would rather continue discussions "than commence proceedings, which can still be done if this matter can not be resolved." [Nicoll Dec., Ex. 15].

## II.      ARGUMENT

**A.      Summary Judgment Standard.**

Summary judgment motions should only be granted if the evidence shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "In ruling on a motion for summary judgment, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his [or her] favor." Orsini v.

LAW OFFICES OF
**NICOLL BLACK & FEIG**
A PROFESSIONAL LIMITED LIABILITY COMPANY
816 SECOND AVENUE, SUITE 300
SEATTLE, WASHINGTON 98104
TEL: 206-838-7555
FAX: 206-838-7515

O/S Seabrooke O.N., 247 F.3d 953, 958 (9th Cir. 2001). The moving party bears the burden of demonstrating that "there is an absence of evidence to support the non-moving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

**B.** **Because P&I is Marine Insurance Governed Judicially Established Rules, ASI was the Insured Under the P&I Policy.**

P&I insurance is a traditional variant of marine insurance and thereby governed by federal maritime law. Certain Underwriters at Lloyds, London v. Inlet Fisheries Inc., 518 F.3d 645, 654 (9th Cir. 2008) ("One type of insurance typifying marine insurance is protection and indemnity insurance …"). Marine insurance policies are maritime contracts and, thus, subject to admiralty jurisdiction. New England Ins. Co. v. Dunham, 78 U.S. (11 Wall.) 1, 14-15 (1870); Thomas J. Schoenbaum, Admiralty & Maritime Law (hereafter "Schoenbaum") § 19-2 (4th ed. 2004); see also, Inlet Fisheries, 518 F.3d at 649. States are free to regulate marine insurance unless there is a judicially established federal rule or a demonstrated need to make one. Wilburn Boat v. Fireman's Fund Insurance Co., 348 U.S. 310 (1955). The Ninth Circuit has held that it is an established rule of federal admiralty law that P&I policies indemnify vessel owners only if their liability arises out of their ownership of an insured vessel. Bohemia, Inc. v. Home Ins. Co.,725 F.2d 506, 509 (9th Cir. 1984). Other cases agree that the rule is established. See, e.g., Inlet Fisheries, 518 F.3d at 649, 654 (citing Schoenbaum § 17-2).

The Fifth Circuit first defined the type of connection required between liability and the insured vessel, and developed the so-called "causal operational relationship test" in 1971:

> There must be at least some causal operational relation between the vessel and the resulting injury. The line may be a wavy one between coverage and noncoverage, especially with industrial complications in these ambiguous amphibious operations plus those arising from the personification of the vessel as an actor in a suit in rem. But where injury is done through nonvessel operations, the vessel must be more than the inert locale of the injury.

Lanasse v. Travelers Ins. Co., 450 F.2d 580, 584 (5th Cir. 1971) (footnote omitted). The Ninth Circuit has followed suit and also applies Lanasse's causal operational relation test when determining whether a liability for which coverage is sought under a P&I policy relates to ownership or operation of an insured vessel. See, City and County of San Francisco, 141 F.3d at 1373 (coverage in a P&I policy

LAW OFFICES OF
**NICOLL BLACK & FEIG**
A PROFESSIONAL LIMITED LIABILITY COMPANY
816 SECOND AVENUE, SUITE 300
SEATTLE, WASHINGTON 98104
TEL: 206-838-7555
FAX: 206-838-7515

means that "only liability connected with negligent operation of listed ships is covered.").

Here, although it is true that PSVOA was named as an insured the P&I policy, ASI, as holder of the insurance certificate on the F/V ALEUTIAN SPIRIT, was the only insured party entitled to coverage under the P&I terms for its liabilities as vessel owner. [See Zuanich Dec., Ex. 2]. Hence, PSVOA, as an association but not itself a vessel owner, was not the object of the P&I insurance at issue; the risks insured were those of ASI, and only in its capacity as vessel owner.[3] The Policy's Fleet Clause (written by Underwriters) states:

> …as a matter of construction each vessel is deemed to be a separate interest, separately insured, in all respects as if a separate policy for the amount set opposite the name of each vessel were issued upon her and the policy is to be read and applied accordingly.

PSVOA is neither a vessel owner nor a Certificate Holder. ASI was the party sued by its crewmember. PSVOA was not sued. Underwriters and National provided ASI, but not PSVOA, a defense under the Policy. The insurers' indemnity obligation on the insurance contract was to ASI, not to PSVOA, both as a matter of contract and as a matter of judicially established federal maritime law.

**C.**  **Under Maritime Law, the Court Employs the "Most Significant Relationship" Test To Determine the Applicable Substantive Law.**

Because the policy is one of marine insurance, there is admiralty jurisdiction over the insurance contract. Inlet Fisheries, 518 F.3d at 649. There is no judicially established rule of maritime law governing interpretation and enforcement of a marine insurance policy suit limitation clause. See, Internat'l School Services, Inc. v. Northwestern Nat. Ins. Co., 710 F. Supp. 86 (S.D.N.Y. 1989) (applying N.Y. law to marine insurance policy limitation clause, noting absence of federal maritime law controlling rule). In the absence of a controlling federal maritime rule, a federal court must apply federal maritime choice-of-law rules to determine which state's law will provide the substantive rule of law governing the issue. Aqua-Marine Constructors, Inc. v. Banks, 110 F.3d 663, 670 (9th Cir. 1997). In the Ninth Circuit, the rules that govern choice-of-law questions under marine insurance

---

[3] The July, 2009 assignment from ASI to PSVOA of its rights under the Policy should not alter the choice of law analysis in any way, nor does it convert PSVOA into the owner of the insured vessel or certificate holder.

LAW OFFICES OF
**NICOLL BLACK & FEIG**
A PROFESSIONAL LIMITED LIABILITY COMPANY
816 SECOND AVENUE, SUITE 300
SEATTLE, WASHINGTON 98104
TEL: 206-838-7555
FAX: 206-838-7515

policies are those supplied by the Restatement (Second) of Conflict of Laws ("REST 2d CONFL"). Id. at 674. To determine the state that "has the most significant relationship to the transaction and the parties," a court considers the following factors: "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties." Id., citing REST 2d CONFL § 188.[4] These factors are evaluated according to their relative importance on the particular issue. REST 2d CONFL § 188(2). The "most significant relationship" test therefore must be applied here to determine the substantive law under which this P&I policy's suit limitation provision is interpreted and applied. See Industrial Indem. Ins. Co. v. U.S., 757 F.2d 982, 986 (9th Cir. 1985) (law where the damage occurred in property damage case applied because that state had "a particularly strong interest in regulating statutes of limitation").

**D.  Alaska Has Most Significant Relationship To Policy's Suit Limitation Clause.**

**1.  The Specific Issue For Analysis Is the Enforcement of a Suit Limitation Provision.**

The "most significant relationship" analysis is issue-specific. Prime Start Ltd. v. Maher Forest Products, Ltd., 442 F.Supp.2d 1113, 1120 (W.D. Wash. 2006); REST 2d CONFL § 188, comment on subsection (1) (courts "are not bound to decide all issues under the local law of a single state."). The factors will "vary somewhat in importance" from issue to issue. REST 2d CONFL § 188, comment on subsection (1). For instance, an issue such as capacity to enter into a contract may elevate the "place of contract" factor as particularly important, see id., whereas the extent to which an insurer may avoid coverage based on a policy provision will tend to focus more on the location of the insured risk. See, e.g., Chesapeake Utilities Corp. v. American Home Assur. Co., 704 F.Supp. 551 (D. Del. 1989) (employing Restatement approach and focusing on location of insured risk in determining scope of covered damages). Here, the issue is the enforceability of the Policy's suit limitation provision.

---

[4] In Banks the court applied the "most significant relationship" test to an action to recover under a performance bond and concluded that Oregon law applied because Oregon had a "strong interest in the protection of its citizens, including Aqua-Marine, against the insolvency of a foreign insurer." Id. at 674.

LAW OFFICES OF
**NICOLL BLACK & FEIG**
A PROFESSIONAL LIMITED LIABILITY COMPANY
816 SECOND AVENUE, SUITE 300
SEATTLE, WASHINGTON 98104
TEL: 206-838-7555
FAX: 206-838-7515

**2.     The Place of Contracting.**

The place of contracting is "a relatively insignificant" factor. <u>Indem. Ins. Co.</u>, 757 F.2d at 986; REST 2d CONFL § 188, comment on subsection (2). There is no reason to heighten its significance in this case. It appears the parties agree that Underwriters were in London, PSVOA and Acordia were in Seattle, and ASI was in Petersburg, Alaska. The parties communicated by telephone, mail, and e-mail. The parties did not do anything to assign significance to the place of contract, such as including a choice of law clause. There is no reason to do so now. <u>See</u> <u>Indem. Ins. Co.</u>, 757 F.2d at 986.

**3.     The Place of Negotiation of the Contract.**

The place of negotiation can be a significant factor for some issues. REST 2d CONFL § 188, comment on subsection (2). However, it is of less importance "when the parties do not meet but rather conduct their negotiations from separate states by mail or telephone." <u>Id.</u>; <u>see</u> <u>Long v. Holland America Line Westours, Inc.</u>, 26 P.3d 430, 433 (Alaska 2001) ("place of negotiation has little impact where, as here, the parties conduct negotiations from separate states by mail and telephone"). And logically, it should be of even less importance when the particular term at issue is part of a form contract (standard SP-38 P&I form), regarding which one can only conclude that no negotiation took place at all. [<u>See</u> Zuanich Dec., Ex. 3, WF00114]. Thus, there is no "place of negotiation," much less any reason to give any weight to this factor in the court's choice of law analysis.

**4.     The Place of Performance.**

The State where performance is to occur under a contract has an obvious interest in the nature of the performance, limitations on performance, the identity of the party who is to perform, and the identity of the party who is to benefit from performance or be harmed from non-performance. REST 2d CONFL § 188, comment on subsection (2). The two performances that are relevant under the P&I Policy are: Underwriters' performance of their indemnity obligation to ASI, and ASI's compliance with the suit limitation provision. The facts relevant to Underwriters' place of performance are: (1) the recipient of its indemnity obligation was ASI, an Alaska corporation; (2) the events giving rise to its indemnity obligation included an injury to an Alaska citizen and employee onboard an Alaska-based

LAW OFFICES OF
**NICOLL BLACK & FEIG**
A PROFESSIONAL LIMITED LIABILITY COMPANY
816 SECOND AVENUE, SUITE 300
SEATTLE, WASHINGTON 98104
TEL: 206-838-7555
FAX: 206-838-7515

vessel, which injury was the subject of an Alaska lawsuit in an Alaska courtroom; (3) the judgment rendered in an Alaska courtroom was in excess of Policy limits; (4) the demand for settlement that prompted the Miller Settlement came from an Alaska attorney representing ASI, his Alaska client; and, (5) the Miller Settlement prevented the filing of a lawsuit against Underwriters in Alaska for bad faith. In light of those facts, the place of performance for Underwriters' indemnity obligation is Alaska. Similarly, ASI, as an Alaska company, would have no reason to suspect that its pursuit of a recovery from Underwriters under the Policy would be governed by any law other than Alaska. The impact upon ASI of enforcement, or not, of the suit limitation provision would be felt only in Alaska. This factor weighs heavily in favor of application of Alaska law.

**5.     The Location of the Subject Matter of the Contract.**

The "location of the insured risk is a critical factor" in a choice of law analysis using the Restatement's "most significant relationship" test. MAPCO Alaska Petroleum, Inc. v. Central Nat. Ins. Co. of Omaha, 795 F.Supp. 941, 944 (D. Alaska 1991). "When the contract deals with a specific physical thing, such as land or a chattel, or affords protection against a localized risk … the location of the thing or of the risk is significant." REST 2d CONFL § 188, comment on subsection (2) (citing to §§ 189-193). "[W]hen the … risk is the principal subject of the contract, it can often be assumed that the parties, to the extent that they thought about the matter at all, would expect that the local law of the state where the thing or risk was located would be applied to determine many of the issues arising under the contract." Id.; see also Indem. Ins. Co., 757 F.2d at 986 ("When insurance is involved, the principal location of the insured risk normally is the state whose law applies."), citing REST 2d CONFL § 193. According to REST 2d CONFL § 193 (which specifically addresses contracts for "fire, surety or casualty insurance"), rights under the insurance contract "are determined by the local law of the state which the parties understood was to be the principal location of the insured risk during the term of the policy."[5] Here, ASI's insurance certificate identifies its operations in "SEAK," which

---

[5] Even if the Court examines the Policy more broadly as one involving multiple risks in multiple States, the "principal location of the insured risk" remains "particularly relevant." REST 2d CONFL § 193, comment f. If, for example, for a policy involved risks in three States, "courts would be inclined to treat such a case, at least with respect to most issues, as if

CV 09-00791 RSM RESPONSE IN OPPOSITION TO PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT - 13

LAW OFFICES OF
**NICOLL BLACK & FEIG**
A PROFESSIONAL LIMITED LIABILITY COMPANY
816 SECOND AVENUE, SUITE 300
SEATTLE, WASHINGTON 98104
TEL: 206-838-7555
FAX: 206-838-7515

means "Southeast Alaska." [Zuanich Dec., Ex. 2]. The F/V ALEUTIAN SPIRIT operated no where else. [Miller Dec., ¶3]. The Policy insured ASI against risk of liability arising out of its vessel ownership vessel in Alaska. The location of the insured risk (*i.e.*, liability as vessel owner) on the Policy is Alaska. This factor weighs heavily in favor of application of Alaska law and should be the deciding factor on the choice of law analysis.

### 6. The Domicile, Residence, Nationality, Place of Incorporation and Place of Business of the Parties.

"These are all places of enduring relationship to the parties." REST 2d CONFL § 188, comment on subsection (2). "Their significance depends largely upon the issue involved and upon the extent to which they are grouped with other contacts." Id. Here, these factors were considered in previous factors and, therefore, this factor has no independent weight in the analysis.

### 7. Alaska's Interests In Having Its Law Applied Outweigh Washington's.

Interpretation of insurance contract provisions pertaining to an insured risk located in Alaska is of significant importance to the State of Alaska. MAPCO Alaska Petroleum, Inc., 795 F.Supp. at 944. By contrast, Washington's interest here, if any, is in promoting enforcement of a provision in an insurance contract subscribed to by an alien insurer concerning a risk located out of state, against the interests of an Alaska resident. Cf. Long, 26 P.3d at 433-434 ("[T]he State of Washington's only interest in the issue at hand is in protecting resident corporations' contract rights relating to torts that they commit in other states."). Underwriters are not residents in Washington, which has no legitimate basis to assert an interest in applying its law to the P&I policy between Underwriters and ASI. Considering the Restatement's "most significant interest" analysis, as well as the interests of the respective States, the Court can only conclude that Alaska law applies to the question of the enforceability of the Policy's suit limitation provision.

---

it involved three policies, each insuring an individual risk." Id. As applied here, an approach that viewed the Policy as one involving multiple vessels in multiple areas of operation would still yield an analysis that focused on the fact that ASI operated its vessel exclusively in Alaska, particularly in light of the Fleet Clause.

LAW OFFICES OF
**NICOLL BLACK & FEIG**
A PROFESSIONAL LIMITED LIABILITY COMPANY
816 SECOND AVENUE, SUITE 300
SEATTLE, WASHINGTON 98104
TEL: 206-838-7555
FAX: 206-838-7515

**E.** **The Policy's Suit Limitation Provision Does Not Limit This Suit Under Alaska Law.**

"An insurance contract is not a negotiated agreement; rather its conditions are by and large dictated by the insurance company to the insured." Estes v. Alaska Ins. Guar. Ass'n, 774 P.2d 1315, 1317 (Alaska 1989). In Estes, the Alaska Supreme Court examined a one-year commencement of suit provision in a case in which the suit was instituted one year and seven days after a claim was denied and held:

> time limit on commencement of suit clauses, notice of loss clauses, proof of loss clauses, and cooperation clauses should all be reviewed on the basis of whether their application in a particular case advances the purpose for which they were included in the policy. Only by so reviewing these clauses can courts satisfy the consumer's reasonable expectation that coverage will not be defeated on arbitrary procedural grounds.

774 P.2d at 1318. The court held that in order to bar the insured's claim for failure to comply with the one-year time limit, the insurer was required to "establish that it suffered as a result of his delay such prejudice as the limit was intended to avoid." Id.[6]

The Alaska Supreme Court extended Estes in the case of Alaska Energy Authority v. Fairmont Ins. Co. to cover a commencement of suit provision in a performance bond relating to a construction project. 845 P.2d 420 (Alaska 1993). The court held that absent a showing of prejudice, the suit commencement provision would not be enforced. Id. at 423. The showing of prejudice remains an established requirement under Alaska law prior to the enforcement of a suit limitation provision like the one Underwriters seek to impose here. See Long, 26 P.3d at 434.

Underwriters do not claim to have been prejudiced. [Amended Complaint, Docket #3]. The word prejudice does not appear in Underwriters' Motion for Summary Judgment [Docket 40], and the

---

[6] In Estes, the court explained the purpose of such provisions and the prejudice that the time limits was intended to avoid:
> The primary purpose of contractual modifications of the statute of limitations is to avoid prejudice, specifically, to avoid the extra danger of fraud and mistake associated with stale claims. Further, prejudice resulting from delay in filing suit seems no more difficult to prove than prejudice resulting from delay in providing notice. If the insurance company could show, for example, that witnesses had died or their memories faded during the insured's delay in filing suit, or that other evidence had been lost, enforcement of the contractual time limit on commencement of suit might be appropriate.

774 P.2d at 1318 (citations omitted).

LAW OFFICES OF
**NICOLL BLACK & FEIG**
A PROFESSIONAL LIMITED LIABILITY COMPANY
816 SECOND AVENUE, SUITE 300
SEATTLE, WASHINGTON 98104
TEL: 206-838-7555
FAX: 206-838-7515

concept of prejudice has not been argued.[7] Id. As a result, under Alaska law, in the absence of a showing of prejudice, the suit limitation provision is unenforceable here. Because Alaska law governs construction and enforcement of the suit limitation provision, the Motion for Summary Judgment must be denied. If the Court agrees, it need read no further inasmuch as the remainder of this response explains why summary judgment cannot be granted even if Washington law governs enforcement of the Policy's suit limitation provision.

**F.    Under Washington Law, Material Fact Issues Concerning Agency, Waiver, Estoppel, Equitable Tolling and Ratification Preclude Enforcement of the Suit Limitation Clause on Summary Judgment.**

Even if the Court considered the suit limitation clause under Washington law,[8] the summary judgment evidence establishes significant questions surrounding whether Underwriters, by their conduct and that of their agents, (a) have waived the suit limitation clause, (b) are estopped from relying upon it, and/or (c) have equitably tolled the limitation clause. As explained below, Underwriters' agents, with actual or apparent authority to bind Underwriters, reached certain agreements to settle the Miller Liability and made certain promises to PSVOA that, in combination with Underwriters' own delays and representations, should preclude Underwriters from relying on the suit limitation provision, even under Washington law.

**1.    Pursuant to the BAA, Both National and Acordia Were Underwriters' Agents Concerning the Matters at Issue.**

Agency is a consensual relationship between two parties pursuant to which one party is subject to the other party's control. See, e.g., Nordstrom Credit, Inc. v. Dep't of Revenue, 120 Wn.2d 935, 941, 845 P.2d 1331 (1993). An entity with authority to issue an insurance policy for a foreign insurer

---

[7] Underwriters would have difficulty arguing prejudice. They delayed responding to the claim for reimbursement in this case from December 26, 2007 until July 31, 2008 and thereafter asked PSVOA not to file suit on February 25, 2009. To Defendants' knowledge all witnesses who are needed to resolve the issues in this case are still available to all parties. Hence, Underwriters have not in fact been prejudiced.

[8] RCW 48.18.200, cited by Underwriters, has no application in this case. By its terms, it does not apply to "marine and transportation insurance" (of which P&I insurance is a variety, see RCW 48.11.050(1)(b) and 48.14.050(2)). Furthermore, it does not apply unless the policy is both "delivered or issued for delivery in" Washington and covers "subjects located, resident, or to be performed in" Washington. RCW 48.18.200. Here the certificate was delivered to ASI in Alaska and the policy covered ASI's liabilities as the ALEUTIAN SPIRIT owner, liabilities that could only occur in Alaska.

LAW OFFICES OF
**NICOLL BLACK & FEIG**
A PROFESSIONAL LIMITED LIABILITY COMPANY
816 SECOND AVENUE, SUITE 300
SEATTLE, WASHINGTON 98104
TEL: 206-838-7555
FAX: 206-838-7515

is that insurer's agent. See Underwriters Subscribing to Lloyd's Ins. Cert. No. 80520 v. Magi, Inc., 790 F.Supp. 1043 (E.D. Wash. 1991). According to the BAA,[9] as confirmed by the correspondence between Acordia and Underwriters, Acordia and Ogden were Underwriters' agents for purposes of binding the Policy and adjusting claims. [Nicoll Dec., Ex. 1, WF00480]. The Policy and the Confirmation of Insurance designate Acordia as Underwriter's agent. [Zuanich Dec., Ex. 2, 3]. National was the "leading domestic insurer" on the Policy, [Id. at Ex. 1], and therefore, pursuant to the BAA, was empowered to make claims handling decisions on Underwriters' behalf. [Nicoll Dec., Ex. 1, WF00502]. Therefore, the evidence establishes that Acordia, Ogden and National were Underwriters' agents with respect to the matters currently before the Court.

**2.    Acordia's and National's Knowledge is Imputed to Underwriters.**

Generally, a principal is chargeable with notice of facts known to its agent. Deep Water Brewing, LLC v. Fairway Resources Ltd., _ Wn. App. _, 215 P.3d 990, 1011 (2009). "In order for an agent's knowledge to be imputed to the principal, an agent must have actual or apparent authority in connection with the subject matter either to receive it, to take action upon it, or to inform the principal or some other agent who has duties in regard to it." Denaxas v. Sandstone Court of Bellevue, L.L.C., 148 Wn.2d 654, 666, 63 P.3d 125 (2003) (internal quotes and citations omitted).

**3.    Acordia and National had Actual and Apparent Authority in Connection with Handling and Reporting on the Jason Miller Claim and Litigation.**

The BAA explicitly conferred claims adjudication and reporting authority on Acordia, [Nicoll Dec., Ex. 1, WF00480], and established National as the "claims leader" who had authority to bind Underwriters to claims handling decisions. [Id., WF 00502]. Thus, both had actual authority with respect to the Miller claims and litigation. Even if they did not have actual authority, Acordia and National had apparent authority.

"Apparent authority is the power held by an agent or other actor to affect a principal's legal

---

[9] A coverholder agreement is a recognized means by which a principal provides authority to an agent. Harris Rutsky & Co. Ins. Services, Inc. v. Bell & Clements Ltd., 328 F.3d 1122, 1127 (9th Cir. 2003) ("Such a contract-the industry parlance is 'coverholder agreement'-allows … the foreign insurer's agent, to bind the foreign insurer to coverage in California. The foreign insurer thereby gains access to California's lucrative insurance markets, from which it is otherwise barred.").

LAW OFFICES OF
NICOLL BLACK & FEIG
A PROFESSIONAL LIMITED LIABILITY COMPANY
816 SECOND AVENUE, SUITE 300
SEATTLE, WASHINGTON 98104
TEL: 206-838-7555
FAX: 206-838-7515

relations with third parties when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations." Restatement (Third) of Agency ("REST 3d AGEN") § 2.03; see also Udall v. T.D. Escrow Services, Inc., 159 Wn.2d 903, 913, 154 P.3d 882 (2007) (An agent has apparent authority when a third party reasonably believes the agent has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations.). Apparent authority is present where the principal's manifestations (1) "cause the one claiming apparent authority to actually, or subjectively, believe that the agent has authority to act for the principal," and (2) "the claimant's actual, subjective belief is objectively reasonable." King v. Riveland, 125 Wn.2d 500, 507, 886 P.2d 160 (1994). Moreover, the actual scope of the agent's authority does not limit the scope of the agent's apparent authority. "[W]hen a principal has vested an agent with 'general authority to engage in a class of transactions, subject to limits known only to the agent and the principal, third parties may reasonably believe the agent to be authorized to conduct such transactions and need not inquire into the existence of undisclosed limits on the agent's authority.'" Udall, 159 Wn.2d at 914, quoting REST 3d AGEN § 3.03 cmt. b at 175.

Here, Underwriters objectively manifested both that Acordia was their agent for the placement of marine insurance and their agent for the handling and reporting of claims. Underwriters also objectively manifested their intent to be bound by claims handling decisions made by National, the so-called "domestic leader." [Nicoll Dec., Ex. 1, WF 00502]. This arrangement was followed over the course of adjusting dozens of claims involving PSVOA members. [See Zuanich Dec., ¶7]. Thus, Underwriters permitted PSVOA to believe that Acordia and National had authority to bind Underwriters in adjusting and reporting claims and, moreover, based upon their course of dealing and the written record, it was reasonable for PSVOA to believe that Acordia and National had authority to bind Underwriters.[10]

Both National and Acordia knew of and approved the Miller Settlement. [Zuanich Dec., Ex. 4].

---

[10] It is undeniable that PSVOA actually relied on their belief that National and Acordia had authority: PSVOA funded a $1 Million settlement with Jason Miller in reliance upon the existence of that authority. [Zuanich Dec., ¶11, Ex. 6].

LAW OFFICES OF
**NICOLL BLACK & FEIG**
A PROFESSIONAL LIMITED LIABILITY COMPANY
816 SECOND AVENUE, SUITE 300
SEATTLE, WASHINGTON 98104
TEL: 206-838-7555
FAX: 206-838-7515

They also knew that the Miller Settlement, if accepted, would result in total payments related to Jason Miller's accident in excess of Policy limits. [Id.; Ex. 4, 5, 6]. Because that information was known to Underwriters' agents, it was known to Underwriters. See Deep Water Brewing, LLC, 215 P.3d at 1011. For the same reasons, Underwriters are also charged with knowledge of the promise made by National to PSVOA's Rob Zuanich on December 21, 2007 that the insurers "were paying the excess amount (above remaining policy limits) of this settlement." Underwriters consequently are charged with knowing that PSVOA was funding the Miller Settlement in reliance on National's promise that both they and National would reimburse PSVOA even though the payments exceeded the Policy's limits. Despite this knowledge,[11] Underwriters took no action to notify its agents, its insured, or PSVOA in a timely manner[12] of its disapproval of the Miller Settlement in excess of Policy limits.

### 4. National's Approval of the Miller Settlement with the Knowledge and Consent of Acordia Bound Underwriters.

Because National was the leading domestic insurer, to whom the BAA bound Underwriters to follow, National's decision to pay the Miller Settlement in excess of Policy limits bound Underwriters to do the same.[13] Moreover, National's promise that the insurers would reimburse PSVOA if it funded the Miller Settlement likewise bound Underwriters. From PSVOA's perspective, it had an agreement with the insurers to be reimbursed and did not know any differently until Underwriters notified

---

[11] Defendants also have a reasonable belief, based on the frequency of Acordia's reports to Underwriters, that Underwriters had actual knowledge of the Miller Settlement prior to PSVOA funding the settlement on December 21, 2007. On December 5, 2007, National recommended the settlement terms [Nicoll Dec., Ex. 5]; two days later on December 7, National accepted the settlement terms. [Nicoll Dec., Ex. 6, 19]. These communications at least present an issue of fact, if any is required, over whether Underwriters were actually informed of the settlement and approved or did not object to the decision to settle for amounts in excess of policy limits. If Underwriters disputes this, the factual dispute is an additional ground on which to allow a continuance under Fed.R.Civ.P. 56(f) for the purpose of conducting discovery into this issue.

[12] PSVOA was not informed that Underwriters were not going to abide by National's commitment to refund PSVOA's outlay until July 31, 2008, more than 7 months after PSVOA funded the Miller Settlement in reliance on National's promise made on behalf of the Policy's insurers. [Zuanich Dec., ¶13].

[13] Underwriters' expected argument that it was not bound to follow National's lead on an "ex gratia" payment does not permit them to avoid the agreement made in light of National's apparent authority to bind Underwriters and in light of Acordia's knowledge of and assent to that agreement. At most, Underwriters' anticipated argument merely raises the mixed contract construction and factual questions of (1) what constitutes an "*ex gratia*" payment, and (2) whether, under the circumstances, the Miller settlement was "*ex gratia*." See National American Ins. Co. of California v. Certain Underwriters at Lloyd's London, 93 F.3d 529, 537 (9th Cir. 1996) (question of fact as to whether reinsurer was bound to follow settlement precluded summary judgment).

LAW OFFICES OF
**NICOLL BLACK & FEIG**
A PROFESSIONAL LIMITED LIABILITY COMPANY
816 SECOND AVENUE, SUITE 300
SEATTLE, WASHINGTON 98104
TEL: 206-838-7555
FAX: 206-838-7515

1    PSVOA on July 31, 2008 that they did not consider themselves bound by National's promise,

2    claiming that agreement was "*ex gratia*."[14] [Nicoll Dec., Ex. 12].

3        **5.**      **Underwriters Waived the Suit Limitation Provision.**

4        Waiver is the intentional relinquishment of a known right. See e.g., Wagner v. Wagner, 95

5    Wn.2d 94, 102, 621 P.2d 1279 (1980); Logan v. North-West Ins. Co., 45 Wn. App. 95, 99, 724 P.2d

6    1059 (1986). Where an insurer initially commits to paying a claim only to later renege on the

7    commitment, it cannot then rely on a suit limitation provision to deprive the insured of the benefits of

8    the policy. Staats v. Pioneer Ins. Ass'n, 55 Wn. 51, 55, 104 P. 185 (1909). In Staats, an insurance

9    adjuster told an insured that the claim would be paid and the court held that the agent's statement

10    constituted a waiver of the insurance policy's suit limitation provision. 55 Wn. at 56 (citing Hall v.

11    Union Central Life Ins. Co., 23 Wn. 610, 614, 63 P. 505 (1900)[15] The Staats court explained:

> In the instant case the delay in the commencement of the action was caused solely by the
> representations of the appellant's adjuster, and it has suffered no prejudice or injury
> therefrom. A corporation can act only through its agents, and they must be held to have such
> power as inheres in the duties they are assigned to perform. The appellant having clothed its
> adjuster with apparent authority to speak for it, and he having induced the respondent to
> delay the commencement of the action until the time limit fixed in the contract had expired, it
> will not now be heard to urge that he exceeded his authority, and invoke the bar.

55 Wn. at 56.[16]

---

[14] Even if an argument could be mounted against the enforceability of the agreement made by National at the time it was made, it has since been ratified by Underwriters' conduct. Conduct which may be held to constitute a ratification of an unauthorized contract "includes the failure to repudiate the contract, as well as affirmative acts which can be justified only if there were an election to authorize the contract." Rayonier, Inc. v. Polson, 400 F.2d 909, 915 (9th Cir. 1968) (applying Washington law); see also Tobias v. Towle, 179 Wn. 101, 105, 35 P.2d 1114 (1934) ("Having failed to repudiate an unauthorized transaction, if in fact it was unauthorized, appellant must be held to have affirmed it). Here, Underwriters knew the urgency of the terms of the Miller Settlement and knew the required payment would push the total spent on the Miller case over Policy's limits. Its agents approved the Miller Settlement. Underwriters took no action to alert anyone of its purported disapproval for over 7 months, until well after (a) PSVOA had funded the settlement, (b) Acordia had submitted a claim to Underwriters for reimbursement, and (c) National had paid its 50% share of the Miller Settlement. "If one maintains silence when in conscience he ought to speak, equity will debar him from speaking when in conscience he ought to have remained silent." Harms v. O'Connell Lumber Co., 181 Wn. 696, 700, 44 P.2d 785 (1935).

[15] Hall and Staats were decided before the passage of the Insurance Code in 1911 (see Gibson v. New York Life Ins. Co., 102 Wn. 180, 183, 172 P. 920 (1918)); however, by its own terms, the Code does not apply to marine insurance. See RCW 48.18.010 ("This chapter applies to insurances other than ocean marine and foreign trade insurances."). As to a marine insurance policy, Hall and Staats remain a fair statement of Washington common law on the issue of an insurer's waiver of a suit limitation provision.

[16] The Staats court also held that the reasonableness of the delay caused by the adjuster was a matter for the jury to decide. 55 Wn. at 56.

LAW OFFICES OF
**NICOLL BLACK & FEIG**
A PROFESSIONAL LIMITED LIABILITY COMPANY
816 SECOND AVENUE, SUITE 300
SEATTLE, WASHINGTON 98104
TEL: 206-838-7555
FAX: 206-838-7515

In the instant case, as in <u>Staats</u>, waiver arises from several facts: (1) the agreement of National and Acordia to the Miller Settlement in excess of Policy limits; (2) National's promise that the insurers would pay the Miller Settlement prior to PSVOA funding the settlement; (3) Underwriters' 7 month delay in denying PSVOA's request for reimbursement and repudiating National's agreement; (4) Underwriters' continued dialogue with PSVOA after their denial of the reimbursement request; and, (5) Underwriters' written request on February 25, 2009 that PSVOA delay filing suit pending further consideration of the matter. In view of the evidence, the Court should find either that Underwriters have waived the suit limitation clause or that there are fact issues on the issue of waiver that preclude its enforcement on summary judgment.

**6.      Underwriters are Estopped From Enforcing the Suit Limitation Provision.**

To prove equitable estoppel, the insured must show (1) conduct inconsistent with the claim afterward asserted; (2) action by the insured on the faith of such conduct; and (3) injury to the insured resulting from allowing the insurer to contradict or repudiate such conduct. <u>Saunders v. Lloyd's of London</u>, 113 Wn.2d 330, 336, 779 P.2d 249 (1989) (citation omitted); <u>see also</u> <u>Chong v. Safeco Ins. Co. of America</u>, 2006 WL 1169788, *4-5 (W.D. Wash. 2006) (J. Martinez) ("Washington courts have consistently held that, in cases involving contractual rather than statutory limitation periods, a party may be equitably estopped from asserting a suit limitation provision 'where a person, by his acts or representations, causes another to change his position to or refrain from performing a necessary act to such person's detriment or prejudice.'"). "The doctrine of equitable estoppel rests on the principle that where a person, by his acts or representations, causes another to change his position or to refrain from performing a necessary act to such person's detriment or prejudice, the person who performs such acts or makes such representations is precluded from asserting the conduct or forbearance of the other party to his own advantage." <u>Dickson v. U.S. Fidelity & Guaranty Co.</u>, 77 Wn.2d 785, 788, 466 P.2d 515 (1970) (citations omitted). One who induces delay will be equitably estopped from asserting the delay as a bar to plaintiff's action, upon the equitable principle that no party will be permitted to profit from his or her own wrongdoing. <u>Glus v. Brooklyn E. Dist. Terminal</u>, 359 U.S. 231, 232-34 (1959). In

LAW OFFICES OF
**NICOLL BLACK & FEIG**
A PROFESSIONAL LIMITED LIABILITY COMPANY
816 SECOND AVENUE, SUITE 300
SEATTLE, WASHINGTON 98104
TEL: 206-838-7555
FAX: 206-838-7515

an insurance context, estoppel precludes an insurer from asserting a right where it would be inequitable to permit the assertion. <u>Buchanan v. Switz. Gen. Ins. Co.</u>, 76 Wn.2d 100, 108, 455 P.2d 344 (1969). The assertion of estoppel does not require the proponent to show that the insurer intentionally, voluntarily, or purposely relinquished the right or privilege. <u>Buchanan</u>, 76 Wn.2d at 108.[17] In general, the estoppel analysis involves issues of fact. <u>Litz v. Pierce County</u>, 44 Wn. App. 674, 683 (1986).

In <u>Dickson</u>, a local claims agent inadvertently failed to forward a claim for a period of about 6 months and when he finally forwarded it to the home office, the claim was denied. The insurance policy at issue contained a one-year suit limitation clause. <u>Id.</u> at 786-87. The court held that the insurer was equitably estopped from asserting the contractual limitation period because the local claims agent actions caused the insured to refrain from filing suit until the rejection by the home office was received. <u>Id.</u> at 788. The same is true in the instant case.

Here, National, the "claims leader," approved the Miller Settlement with the full knowledge of Acordia, Underwriters' agent under the BAA. National committed the Policy's insurers to reimbursing PSVOA if it would fund the settlement, even though the settlement would result in payments in excess of Policy limits. Ogden knew of and approved the settlement. PSVOA would not have funded the settlement but for the written assurance it received from National, with Acordia's knowledge, that it would be reimbursed by the insurers. [Zuanich Dec., ¶11]. Acordia submitted a reimbursement claim on PSVOA's behalf to Underwriters on December 26, 2007, a few days after PSVOA funded the Miller Settlement. It was not until 7 months later that Underwriters repudiated the earlier agreement and promises made by National. Thereafter, PSVOA and Underwriters engaged in written and verbal communication concerning the matter, resulting in Underwriters' request on February 25, 2009 that PSVOA refrain from initiating litigation while the matter was under further consideration. Ten days prior to the filing of this lawsuit, Underwriters wrote to PSVOA informing them that it was discussing

---

[17] The nonwaiver provisions of RCW 48.18.470, which do not in any event apply to this marine P&I Policy, say nothing about estoppel. <u>See Buchanan</u>, 76 Wn.2d at 107-09.

LAW OFFICES OF
**NICOLL BLACK & FEIG**
A PROFESSIONAL LIMITED LIABILITY COMPANY
816 SECOND AVENUE, SUITE 300
SEATTLE, WASHINGTON 98104
TEL: 206-838-7555
FAX: 206-838-7515

the issue with its advisors. [Nicoll Dec., Ex. 18]. Underwriters should therefore be estopped from relying on the suit limitation provision. At the very least, there are questions of fact concerning estoppel that preclude enforcement of the suit limitation provision on summary judgment.[18]

**G.   The Suit Limitation Provision Only Affects Causes of Action "On the Policy."**

Contractual suit limitations provisions do not bar tort or statutory claims, but apply only to claims on the policy. Keith v. CUNA Mut. Ins. Agency, Inc., 2009 WL 1793675, *4 (W.D. Wash. 2009); see also Chong, 2006 WL 1169788 at *5 ("The parties agree that the limitation period applies only to plaintiffs' breach of contract claims, but not to plaintiffs CPA or bad faith claims."). Defendants have asserted that Underwriters' breach of the agreement to reimburse PSVOA for funding the Miller Settlement constitutes the breach of a separate agreement. A cause of action for breach of contract accrues upon its breach. See Schwindt v. Commonwealth Ins. Co., 140 Wn.2d 348, 353, 997 P.2d 353 (2000). Underwriters' breach of the agreement to reimburse PSVOA did not occur earlier than July 31, 2008. Thus, the suit limitation provision would not bar PSVOA's claims for reimbursement even if the Policy's suit limitation provision is applied to the reimbursement claim. ASI has also asserted bad faith claims. Washington courts have generally held that the duty of good faith and fair dealing does not arise solely out of the parties' contractual relationship, and is therefore not subject to contractual limitation periods. See, e.g., 1515-1519 Lakeview Blvd. Condominium Ass'n v. State Farm Fire and Cas. Co., 105 Wn. App. 1016, 2001 WL 244383, *4 (2001) ("the duty of good faith and fair dealing does not arise solely from a contractual relationship, but also from the law that independently requires a party to fulfill its contractual responsibilities") (citation omitted). ASI has asserted, in the alternative, Consumer Protection Act claims. These would also not be subject to an

---

[18] Principles of equitable tolling are also applicable. See, Millay v. Cam, 135 Wn.2d 193, 206, 955 P.2d 791 (1998) (the predicates for equitable tolling are "bad faith, deception, or false assurances by the defendant and the exercise of diligence by the plaintiff."). Underwriters delayed responding to PSVOA's claim for reimbursement for 7 months. PSVOA learned of Underwriters' decision to reject National's commitment to reimburse on July 31, 2008. From that date until February 25, 2009, when Underwriters asked PSVOA not to file a lawsuit, less than 7 months had elapsed. Underwriters filed suit on June 11, 2009. PSVOA filed its counterclaims and those of ASI on July 10, 2009. If the Court considers the time period to be equitably tolled during Underwriters' delay and after it specifically asked PSVOA not to initiate litigation (i.e., December 22, 2007-July 30, 2008; February 25, 2009-June 11, 2009), ASI's counterclaims under the Policy (filed by PSVOA as ASI's assignee) were filed timely, well within one year.

LAW OFFICES OF
**NICOLL BLACK & FEIG**
A PROFESSIONAL LIMITED LIABILITY COMPANY
816 SECOND AVENUE, SUITE 300
SEATTLE, WASHINGTON 98104
TEL: 206-838-7555
FAX: 206-838-7515

insurance policy's suit limitation provision under Washington law. See McKee v. AT & T Corp., 164 Wn.2d 372, 399, 191 P.3d 845 (2008) (holding suit time limit provisions in consumer contracts of adhesion inapplicable to CPA claims as a matter of public policy).

## III.  CONCLUSION

Because Alaska law governs interpretation and enforcement of the Policy's suit limitation provision, and because Underwriters have neither alleged nor offered evidence to establish prejudice, the provision does not bar Defendants' counterclaims. Even if Washington law applies, the suit limitation provision should not be enforced because Underwriters have by their action and inaction either waived it or are estopped from enforcing it. Further, even if Washington law applies, and the suit limitation is enforced despite the evidence supporting waiver and estoppel, the suit limitation provision cannot apply to PSVOA's and ASI's extra-contractual causes of action. At the very least, there are substantial fact issues that would preclude enforcement of the suit limitation provision under Washington law.

DATED this 26th day of October, 2009.

NICOLL BLACK & FEIG PLLC


   /s/Christopher W. Nicoll
Christopher W. Nicoll, WSBA #20771
Chris P. Reilly, WSBA #25585
Attorneys for Defendants Purse Seine Vessel Owners
Association, F/V Aleutian Spirit, Inc., and Robert Kehoe

LAW OFFICES OF
**NICOLL BLACK & FEIG**
A PROFESSIONAL LIMITED LIABILITY COMPANY
816 SECOND AVENUE, SUITE 300
SEATTLE, WASHINGTON 98104
TEL: 206-838-7555
FAX: 206-838-7515

## DECLARATION OF SERVICE

I hereby certify that on this 26th day of October 2009, I electronically filed the foregoing **RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following parties of record registered with CM/ECF:

Robert J. Bocko, WSBA 15724
Keesal, Young & Logan
1301 Fifth Avenue, Suite 1515
Seattle, WA 98101
206-622-3790 Telephone
206-343-9529 Facsimile
*Attorneys for Plaintiff*

Geoff J.M. Bridgman, WSBA #25242
Emily Harris Gant, WSBA #35679
Ogden Murphy Wallace P.L.L.E.
1601 Fifth Avenue, Suite 2100
Seattle, Washington 98101-1686
Tel: 206.447.7000
Fax: 206.447.0215
*Attorneys for Third-Party Defendant National Casualty Co.*

NICOLL BLACK & FEIG PLLC


 /s/Christopher W. Nicoll
Christopher W. Nicoll

1165.0001/31448

LAW OFFICES OF
**NICOLL BLACK & FEIG**
A PROFESSIONAL LIMITED LIABILITY COMPANY
816 SECOND AVENUE, SUITE 300
SEATTLE, WASHINGTON 98104
TEL: 206-838-7555
FAX: 206-838-7515